# FARHANG & MEDCOFF

## — ATTORNEYS —

4801 East Broadway Boulevard, Suite 311
Tucson, Arizona 85711
T: 520.214.2000
F: 520.214.2001

Ali J. Farhang (#019456)
afarhang@farhangmedcoff.com

Roscoe J. Mutz (#030696)
rmutz@farhangmedcoff.com

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Heidi Yribar, | Case No. |
| Plaintiff, | |
| v. | **Complaint** |
| Hexagon Mining, Inc., an Arizona corporation, | (Jury Trial Demanded) |
| Defendant. | |

Plaintiff Heidi Yribar, for her Complaint against Defendant Hexagon Mining, Inc., alleges as follows:

## PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff is a married person who resides in Pima County, Arizona.

2.      Defendant Hexagon Mining, Inc. is an Arizona corporation whose principal place of business is in Pima County, Arizona.

3.      This Court has subject matter jurisdiction over the federal law claims pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 2000e-5(f)(3).

4.      This Court has supplemental jurisdiction over Plaintiff's claims arising under Arizona law pursuant to 28 U.S.C. § 1367 because such claims are related to Plaintiff's

1   claims within this Court's original jurisdiction that they form part of the same case or

2   controversy under Article III of the United States Constitution.

3       5.      Defendant caused events or omissions in Arizona that gave rise to Plaintiff's

4   damages and is, for that and other reasons, subject to the personal jurisdiction in this Court.

5       6.      Defendant operates and/or resides in this judicial district and caused the

6   events giving rise to this lawsuit to occur in this judicial district. Accordingly, venue is

7   proper in this Court pursuant to 28 U.S.C. § 1391(b).

8                                **GENERAL ALLEGATIONS**

9       7.      In February 2018, Defendant recruited Plaintiff to serve as Defendant's Field

10  and Channel Marketing Manager.

11      8.      On Plaintiff's first date of employment on February 26, 2018, Defendant's

12  Marketing Director, Annie Wissner, informed Plaintiff that Defendant was changing her

13  title from Manager to Specialist, as a team member expressed concern that Plaintiff would

14  be in a senior role. Wissner informed Plaintiff the title change was temporary and that she

15  would adjust it back as soon as she could.

16      9.      From February through May 2018, Plaintiff received stellar feedback on all

17  projects and had a good personal rapport with Wissner. Wissner informed Plaintiff that

18  Plaintiff was the most experienced team member and most likely candidate to take

19  Wissner's position when she left.

20      10.     Wissner worked out of Denver but visited the Tucson office about every six

21  weeks. When she visited Tucson, Wissner began commenting on Plaintiff's appearance,

22  which made Plaintiff uncomfortable; specifically, Wissner commented on Plaintiff's

23  feminine and somewhat formal attire (i.e., dresses) and her figure and looks. On one visit,

24  Wissner called Plaintiff into her office to show her flattering photographs of Wissner and

25  commented, "Look, I used to be skinnier than you."

26      11.     Between May and June of 2018, Wissner advised the marketing team to make

27  an effort to contact customers and Defendant's sales team. Plaintiff suggested both a

28  regional tour to meet sales managers and teams in person, as well as efforts to visit mine

FARHANG & MEDCOFF
ATTORNEYS

sites. Wissner rejected the Plaintiff's suggestions because it was "not safe for a pretty girl" to travel to places like Mexico, Africa, or areas of Latin America.

12. Instead, Wissner approved a male team member, Neville Judd, to travel to Africa and Columbia for customer visits.

13. During the same period, Wissner made comments about making sure sales managers were having lunch with Plaintiff "for the right reasons." On information and belief, Wissner and team member Tracy Sole de Hoop made jokes and negative remarks about Plaintiff's clothing on several occasions.

14. On information and belief, neither Wissner nor Sole de Hoop made jokes and negative remarks about any male team member's clothing or suggest that sales managers have lunch with male team members "for the right reasons."

15. In June 2018, most of the marketing team received invitations to attend "Hexagon LIVE" but Plaintiff did not. On information and belief, during a cocktail hour, Wissner made additional comments regarding Plaintiff's physical appearance, including that the men in the sales department "certainly like her," inferring they like her looks, not her work.

16. During a visit to Tucson in June 2018, Wissner scheduled meetings with marketing team members, but intentionally left Plaintiff out of the meetings. Wissner also did not invite Plaintiff to dinner and drinks with the team members.

17. During a one-on-one conference call with Wissner in June 2018, Plaintiff confronted her about the changed work environment and hostility. Wissner told Plaintiff that many team members viewed Plaintiff as overstepping her position to try to take on leadership roles. Wissner also told Plaintiff that team members believed Plaintiff was trying to take Wissner's job.

18. On information and belief, no other similarly situated male employees where ostracized, criticized, or blacklisted from meetings and work events due to being ambitious and motivated.

19.     In July 2018, Sole de Hoop continued criticizing Plaintiff and creating a hostile work environment due to Plaintiff working on projects that Sole de Hoop considered hers, including the "Life-Of-Mine" marketing project.

20.     On or about July 9, 2018, Plaintiff met with Wissner to request clarification on a project. During the meeting, Wissner became agitated and aggressively asked why Plaintiff was "questioning her." Wissner stood up, yelled that she would not tolerate being treated that way by a subordinate, and told Plaintiff to leave the office. Plaintiff left her office. Within minutes, Plaintiff received a message to meet with Rachel Mannino, human resources, and Wissner. During the meeting, Wissner told Mannino that she could not work with Plaintiff. When Mannino pressed for reasons beyond Plaintiff merely asking questions on a particular project, Wissner told Mannino that Plaintiff worked too much. Plaintiff responded that she was new to Hexagon and the mining industry. Mannino asked Wissner whether she provided Plaintiff with training, and Wissner responded that Plaintiff learns everything just fine on her own. The meeting ended with no resolution.

21.     On July 10, 2018, during a team planning meeting, Wissner was hostile toward Plaintiff, including without limit interrupting her and disagreeing for the sake of disagreeing. After Plaintiff's presentation, Wissner looked directly at Plaintiff and announced to the team that layoffs were forthcoming.

22.     During the June to July period, Plaintiff excelled at her job. Defendant gave her two pay bonuses and Bose headphones for her excellent work on the headquarters move and for bringing in record sponsorships for Hexagon LIVE.

23.     After the meeting in which Wissner threatened Plaintiff with a layoff, Plaintiff requested a meeting with Hexagon CFO, Nick Hare, who Plaintiff worked with on the Hexagon headquarters move. Plaintiff asked Hare for advice on how to proceed with Wissner and Sole de Hoop and with respect to the threat of layoffs. Hare stated no layoffs were being considered, and that he has never heard of a manager telling an employee they work too much. Hare confirmed he only heard positive comments regarding Plaintiff's work

FARHANG & MEDCOFF
ATTORNEYS

performance, suggested Plaintiff have an honest dialogue with Wissner, and if that did not work, to follow up with human resources or Hexagon President, Josh Weiss.

24.     On July 24, 2018, Plaintiff had a follow up meeting with Wissner and Mannino. During the meeting, Wissner confirmed Plaintiff's positive work attributes, but repeated her comment about the sales team liking her for her physical appearance.

25.     After the meeting with human resources, Plaintiff confronted Wissner about her knowledge of discussions Wissner had with Sole de Hoop about Plaintiff's appearance and clothing. Surprisingly, Wissner confirmed those discussions and apologized. Wissner started to cry and said she was going through many personal issues and begged for Plaintiff's forgiveness for the way she treated Plaintiff. Wissner admitted to hiding from Plaintiff earlier that day and apologized for excluding Plaintiff from marketing team meetings. After the meeting, when Wissner saw Plaintiff and her husband, Dan Yribar, having lunch outside the office, Wissner told Plaintiff's husband, "You must just hate me, I want to jump off the building, I'm just so sorry – I'm going through a lot right now and I just love your wife and your family." Plaintiff's husband gave Wissner a hug and comforted her.

26.     In August 2018, Wissner resigned as marketing director. Plaintiff submitted a formal application, including a cover letter, resume, and marketing business plan. Plaintiff has over twenty years of marketing and business development experience, which include positions such as Vice President of Marketing, Production Manager, Director of Marketing, and National Advertising Manager. Despite these qualifications, Defendant did not offer her an interview with Josh Weiss, President.

27.     In August 2018, Plaintiff began experiencing mental distress and physical manifestations of the hostile work environment, including weight change and poor sleep.

28.     In October 2018, Defendant promoted Sole de Hoop to the Marketing Director position. Plaintiff met with Sole de Hoop, who informed Plaintiff that Wissner was 100% behind the hostility Sole de Hoop previously demonstrated toward Plaintiff, and that

she felt bad because Plaintiff does "great work and has great ideas." Plaintiff requested that they put the past behind them and start fresh.

29.    In October 2018, both Human Resources employee Esmeralda Saylor and Sole de Hoop informed Plaintiff that she would receive a promotion to Senior Global Field and Channel Manager.

30.    In November 2018, Saylor and Sole de Hoop called Plaintiff to a meeting. They presented Plaintiff with a Performance Improvement Plan (PIP) due to "overstepping her role," which was chalk full of falsities, including: (a) scheduling a lunch with the Tucson Chamber of Commerce – which CFO Nick Hare requested; (b) having a call with PPM Marketing Director – a follow-up to a sales request at the Australia meeting and on-going project previously assigned by Wissner; (c) failing to copy Sole de Hoop on an email to an employment candidate – which occurred *before* Plaintiff knew the person was an employment candidate or even had an interest in the position; and (d) not alerting Sole de Hoop to a blog Plaintiff wrote that a customer initially approved before a separate department requested it be removed. Plaintiff explained the error in each of these examples, including that final approval of the blog post was made by other marketing team members, including male employees Neville Judd and Matthew Devitt. On information and belief, neither Judd nor Devitt received any discipline, while Defendant gave Plaintiff a PIP.

31.    During the meeting Sole de Hoop also accused Plaintiff of making derogatory comments about the marketing department in a self-evaluation. Plaintiff adamantly denied these false allegations and provided Saylor with her self-evaluation to prove it only had positive remarks about the marketing team.

32.    On December 4, 2018, Plaintiff submitted a rebuttal to the PIP with supporting documentation that confirmed the false nature of the allegations against her.

33.    On December 13, 2018, Defendant revoked the PIP and replaced it with a written warning, but also eliminated Plaintiff's promotion to Senior Global Field and Channel Manager and eliminated her involvement in projects for which Plaintiff previously expressed personal pride.

FARHANG & MEDCOFF
—— ATTORNEYS ——

00767126.2

34.     On December 13, 2018, Plaintiff provided Saylor with a document outlining the dates and details of the sexual harassment, bullying, exclusionary treatment, and hostile and intimidating work environment discussed herein. To date, Defendant took no action.

35.     Between June 2018 and February 2020, Plaintiff discussed grievances and sought counsel and/or guidance regarding ongoing discrimination, bullying, harassment, and hostile work environment from the following Human Resources and executive level personnel at Hexagon: Esmeralda Saylor, HR Director; Rachel Mannino, Human Resources employee; Jannett Sanora, Human Resources Employee; Rodrigo Couto, Regional Sales Director; Tom Bobo, Director, Business Development; Raul Gomez, IT Director; Neville Judd, Communications Director; Nick Hare, CFO (now President of Defendant); and Laura Hearron, Executive Assistant to President.

36.     Despite her reports of ongoing discrimination, bullying, harassment, and hostile work environment to multiple decisionmakers at Hexagon, Defendant took no meaningful action and the discrimination, bullying, harassment, and hostile work environment continued.

37.     In December 2018, Sole de Hoop failed or refused to provide Plaintiff with a performance review and refused any salary increase. On information and belief, all similarly situated male employees received a review and salary increases.

38.     In January 2019, the entire marketing team was scheduled to move desks from floor 3 to floor 4 of the building. During a meeting with Sole de Hoop, she told Plaintiff they were short on desk space on the fourth floor and asked Plaintiff to remain on the third floor. On information and belief, Sole de Hoop informed Laura Hearron that Plaintiff requested to stay on the third floor. CFO Nick Hare insisted the entire marketing team move to the fourth floor, and when Plaintiff went to the fourth floor she found two empty and available desks, demonstrating Sole de Hoop's efforts to further separate Plaintiff from the marketing team and create a hostile and intimidating workplace.

39.     On information and belief, Sole de Hoop informed Regional Sales Manager, Andrew Crose, that Plaintiff took credit for work completed by co-worker, Liann Zimmer.

00767126.2

When Crose asked Zimmer why Plaintiff took credit for her work, Zimmer corrected him and stated that Plaintiff gave credit where it was due.

40.     On February 12, 2019, Plaintiff interviewed and was hired to relocate from marketing to business development. In her business development role, Plaintiff needed to partner with the marketing department to utilize graphic design, videographers, social media, product marketing collateral, and tradeshow/event resources. However, Sole de Hoop continued to refuse to work with Plaintiff.

41.     Sole de Hoop continued to disparage Plaintiff and foster a hostile and intimidating workplace. Plaintiff's supervisor, Marc Barmettler, asked why Sole de Hoop had such an issue with Plaintiff. Barmettler expressed concern that Sole de Hoop acted unprofessionally toward Plaintiff, and he suggested that the business development department should stop trying to work with the marketing department because of Sole de Hoop's behaviors toward Plaintiff.

42.     On information and belief, Sole de Hoop directed employees in the marketing department, including graphic designers, product marketing specialists, field and channel marketing specialists, and social media specialists, not to work with Plaintiff.

43.     In March 2019, Plaintiff began teaching herself how to create videos, and she launched a technology partnership on her own. She also began learning graphic design tools, such as Adobe illustrator.

44.     In April 2019, Plaintiff met Rick Grinnel, President of the AZ Mining Alliance, at a luncheon and discussed an opportunity to hold the next AZ Mining Alliance meeting at Hexagon. Plaintiff made efforts to reserve the space and worked on other logistics related to the luncheon. On information and belief, Sole de Hoop met Grinnel at another industry event, and Sole de Hoop discredited Plaintiff, stating that Plaintiff was neither qualified, nor authorized to approve hosting the event. Sole de Hoop told Grinnel he would need to work with Sole de Hoop only. Grinnel called Plaintiff and informed her that the interaction made him very uncomfortable and suggested hosting the event elsewhere.

00767126.2

45.     In August 2019, Plaintiff requested an employee performance and salary review. During her time at Hexagon, she never received an employee review or salary increase.

46.     On August 13, 2019, at the company Town Hall event, President Josh Weiss made a request of all employees for ideas to promote a Sustainability Initiative – an endeavor the company was rolling out across all divisions. Plaintiff told Weiss she had ideas and asked about the correct format to submit them. Weiss asked her to email him with her ideas. Plaintiff worked over the weekend on a PowerPoint presentation, which she sent to Weiss. Weiss responded by thanking her and telling her that he wanted to move forward with some of her suggestions and wanted her involved in the project. Plaintiff responded that she would be thrilled to be involved, but needed to confirm with her manager, Marc Barmettler.

47.     When Plaintiff discussed the proposal and Weiss's positive response with Barmettler, he was furious. He insisted that despite Weiss's invitation for ideas, she was not to communicate with anyone above Barmettler's level. He stated, "this makes you look very bad, Heidi. People ask if you don't have enough work to do." Barmettler insisted Plaintiff did not reply to any emails from Weiss, but to forward them to him. Plaintiff complied, and later Barmettler informed Plaintiff that he met with Sole de Hoop and that Sole de Hoop would execute Plaintiff's project plan for the Sustainability Initiative.

48.     On information and belief, no male employees who submitted ideas to promote a Sustainability Initiative were chastised and stripped of their ability to work with the President of Hexagon on ideas they created and developed. Additionally, on information and belief, no male employees were criticized or disciplined for communicating above the level of their immediate supervisor and/or for being ambitious in general.

49.     Barmettler began treating Plaintiff with hostility and disdain. He refused to meet with Plaintiff in the office and began making condescending comments such as "how about you take 5 minutes on this task instead of your typical one minute."

00767126.2

FARHANG & MEDCOFF
ATTORNEYS

50.     On or about September 26, 2019, Plaintiff confronted Barmettler regarding his hostile and offensive conduct. Plaintiff told Barmettler that she continued to strive to provide accurate, high quality work and that she requested a meeting to discuss expectations. Barmettler confirmed Plaintiff delivered high quality work and that he believed she had good intentions, but that his real issue was Plaintiff volunteering ideas for the Sustainability Initiative and applying for the Visibility Program – a cross-divisional project open to all employees to collaborate together. Barmettler eventually stated he was under the impression that Plaintiff was expressly told to refrain from communicating with executives, and that human resources confirmed Plaintiff should never communicate with executives without permission, which is false. Sole de Hoop attempted to initiate this prohibition for Plaintiff within the scope of the marketing department. Not only was this prohibition inconsistent with Defendant's Open Door Policy, but similarly situated male employees were not prohibited from communicating with executives.

51.     On September 28, 2019, Plaintiff submitted an online complaint with the EEOC to meet and review her options. On information and belief, Defendant became aware of this complaint submission.

52.     During the fourth quarter of 2019, Plaintiff continued to excel in her new position. She succeeded in scheduling meeting with Coal India and Kinross, Russia – both leading to sales opportunities. In India, the tradeshow booth she designed won an innovative design award. Plaintiff ended the quarter with a 2020 Marketing Plan for Russia, India, and China that was approved unanimously. These were new markets for Hexagon, and Plaintiff was responsible for developing and managing product marketing and brand awareness campaigns, including print and digital advertising, events, and PR. Plaintiff also customized a mergers and acquisition platform and PowerPoint video presentation on the platform, reviewed and approved at highest level, by Ola Rollen, Hexagon CEO, prior to roll-out to all Hexagon divisions.

53.     On December 10, 2019, Plaintiff met with Barmettler. Barmettler informed Plaintiff her positive attitude, willingness to jump on projects, and work ethics were

00767126.2

FARHANG & MEDCOFF
—— ATTORNEYS ——

positives. After approximately five minutes of stating her positive qualities, Barmettler spent approximately 55 minutes berating Plaintiff for her prior communications with executives. Plaintiff was confused and asked if something else happened. Barmettler said no, nothing new happened, but he wanted to make it clear that Plaintiff was almost fired for communicating with Weiss, despite his request for ideas. Barmettler told her that if Plaintiff reached out to any executive without consent of her direct supervisor, she would lose her job. He stated, "I'm not threatening you Heidi, I'm warning you. You hurt your image forever. Perception is reality."

54.    On information and belief, Defendant never threatened the loss of employment to similarly situated male employee because they communicated with executives without the express consent of supervisors.

55.    Barmettler also informed Plaintiff he was transferring to Russia, but she would continue with other projects like market expansion marketing and mergers and acquisitions with the finance team Plaintiff did not receive an official performance evaluation and never received a salary increase. On information and belief, male employees within the Business Development department received, at a minimum, cost of living salary increases.

56.    On January 15, 2020, Plaintiff transferred to the finance team as a Business Development Associate. Although her 2019 projects received high marks, Defendant informed her she was not eligible for a raise because the Business Development Associate position was viewed as a demotion.

57.    Plaintiff's new supervisor, Penny Simpson, informed Plaintiff that she would be supporting team members earning less than her, so the chances for a pay increase in the future were unlikely. Simpson also informed Plaintiff she was concerned Plaintiff would be unable to utilize her existing skills, nor have the potential for promotion.

58.    In a meeting with Simpson and Esmeralda Saylor of human resources, Simpson informed Plaintiff that when working on a project, all communications must go through her teammates. Simpson looked at Saylor, and Saylor looked at Plaintiff and asked,

00767126.2

1  "Do you understand?" Plaintiff felt the tone and tenor of the meeting was to encourage
2  Plaintiff to resign.

3      59.    On January 8, 2020, despite prior approval from Nick Hare, CFO, and human
4  resources, Defendant revoked Plaintiff's request for tuition reimbursement.

5      60.    Despite Simpson informing Plaintiff that her role in the finance department
6  would be merely a supporting role, on her first day with the finance team, Plaintiff learned
7  that for the first quarter, she would be required to continue to execute and manage all RIC
8  marketing plans, oversee tradeshow plans, advertising, and sales campaigns for Marc
9  Barmettler. In addition, she was to evaluate industry needs in comparison to technology,
10 look for gaps and begin developing a mergers and acquisitions pipeline strategy, track the
11 market, look for industry trends, maintain competitive analysis, and build out a mergers and
12 acquisitions software platform from evaluation through integration phase to be utilized
13 corporate-wide across eight divisions. In addition, she was required to build a reference
14 repository for the global sales team and create a market trends newsletter that captures best
15 revenue and marketing opportunities. In short, projects that required in-depth technical
16 knowledge of Hexagon's products, a savvy ability to identify business opportunities and
17 capacity to communicate ideas and concepts that would align sales, marketing, and product
18 development – projects indicative of a highly educated, experienced senior role.

19     61.    On information and belief, Defendant did not require any similarly situated
20 male employees at Plaintiff's pay grade to manage such a workload. While Plaintiff enjoyed
21 a heavy workload – and would often volunteer for work – she was not paid equally to male
22 employees with the same or similar workload.

23     62.    On January 27, 2020, Plaintiff received a Master of Business Administration
24 (MBA) Degree from University of Phoenix. She graduated with a 3.93 GPA.

25     63.    On or about January 28, 2020, Juergen Dold, the President of Geosystems,
26 Defendant's divisional parent company, gave a keynote speech to employees of Defendant
27 and discussed topics such as diversity in the workforce. During the presentation, Dold stated
28 his preference is that all the guys he hires are just like him, but in a global company that is

FARHANG & MEDCOFF
ATTORNEYS

00767126.2

not possible. He expressed pride in the diversity of the company and the diversity of nationalities.

64.     During a question and answer session after the keynote speech, Plaintiff asked Dold what percentage of executive level leadership are women. Dold seemed surprised and uncomfortable by the question and responded to the effect of, "I don't know…this is a question for human resources…I think no more than 20-25%...listen, I do not believe in having to fill a quota…when you have meetings at this level and you have women and everyone wants to talk, it is not effective. Our industry has a lot of engineering [awkward laugh]…I'm very sorry that I cannot answer your question. HR? Can you look into this?" The correct answer was 0%. There were zero women on the organizational chart Dold presented with the keynote speech. In *all* of Geosystems thirty-four (34) executive positions listed on their website, there are only two women, which is about 6%.

65.     On information and belief, Defendant edited out the question and answer session of the presentation before placing the video on the intranet for employee access.

66.     On information and belief, Sole de Hoop instructed Defendant's in-house videographer to remove the question and answer session from the presentation video.

67.     Following her public questioning of Dold, Plaintiff's supervisor, Penny Simpson, sent Plaintiff finance-related tasks without little to no instruction, claiming no time to meet despite Plaintiff recently starting in the finance department.

68.     Specifically, Plaintiff asked Simpson for instruction on OPEX report tasks assigned. The formulas were not pulling through on the report and Plaintiff did not know where the raw data populated. Plaintiff asked to meet with Simpson, who claimed to be too busy to meet.

69.     Plaintiff requested assistance from Mario Hidalgo, a finance team veteran, who reviewed the task Simpson provided Plaintiff and asked, "Why is she testing you? You would never know this if someone didn't show you. She wants you to fail."

70.     On January 30, 2020, Plaintiff met with an EEOC intake specialist to discuss her online complaint.

FARHANG & MEDCOFF
— ATTORNEYS —

71.     On February 4, 2020, merely five business days after Plaintiff very publicly questioned Dold about female executive representation and three business days after meeting with the EEOC, Defendant notified Plaintiff and informed her that Hexagon terminated Plaintiff's employment and her last day of employment would be February 28, 2020.

72.     During the termination meeting, Plaintiff explicitly asked Human resources representative Esmeralda Saylor if the termination was because she questioned Dold. Saylor responded, "No, it is not."

73.     Defendant's stated reason for the termination of Plaintiff's employment – performance issues related to a lack of Excel skills – was pretextual. On February 6, 2020, Plaintiff took a finance-related Excel test and the results demonstrated an overall rating of "highly proficient." Defendant set Plaintiff up to fail for discriminatory and retaliatory reasons.

74.     Defendant offered Plaintiff a Transition Agreement and General Release of All Claims (the "Transition Agreement"), requiring Plaintiff's signature by February 11, 2020.

75.     The Transition Agreement confirmed Plaintiff's last date of employment would be February 28, 2020 (defined as the "Separation Date") and     "Hexagon will continue to pay [Plaintiff] at her regular rate of compensation … through the Separation Date. . . . regardless of whether [Plaintiff] signs [the Transition Agreement]."

76.     On February 17, 2020, Esmeralda Saylor, Director of Human Resources, contacted Plaintiff to extend the deadline to sign the Transition Agreement and threatened to withhold pay and COBRA benefits if Plaintiff refused to sign.

77.     Plaintiff refused to sign the Transition Agreement.

78.     On February 18, 2020, despite Defendant's written promise to pay Plaintiff through February 28, 2020 regardless of whether she signed the Transition Agreement, Esmeralda Saylor contacted Plaintiff to state Defendant would only pay her through February 11, 2020.

00767126.2

FARHANG & MEDCOFF
ATTORNEYS

79.     To date, Defendant only paid Plaintiff through February 11, 2020.

80.     Despite pretextually claiming to terminate Plaintiff's employment due to alleged poor performance, Defendant paid Plaintiff a bonus on or about February 7, 2020.

81.     On information and belief, when Plaintiff filed for unemployment benefits, Defendant intentionally provided the wrong employer information, falsely claiming Plaintiff worked for Leica Geosystems. As a direct result, Plaintiff's unemployment claims were repeatedly denied from the date of first filing, March 1, 2020, until Plaintiff received her first unemployment check on May 19, 2020.

82.     As a result of Defendant's actions, Plaintiff suffered severe mental and physical distress, including without limit, severe anxiety, loss of sleep, and hair falling out.

## <u>COUNT I – DISCRIMINATION IN VIOLATION OF TITLE VII</u>

83.     Plaintiff incorporates herein by this reference each and every preceding allegation as if fully set forth herein.

84.     Title VII of the Civil Rights Act of 1964, codified at 42 U.S.C. § 2000e, et seq. ("Title VII"), makes it an unlawful employment practice under federal law for an employer to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. 42 U.S.C. § 2000e–2(a)(1).

85.     The phrase "terms, conditions, or privileges of employment" evinces a congressional intent "to strike at the entire spectrum of disparate treatment of men and women" in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment.  <u>Meritor Savings Bank, FSB v. Vinson</u>, 477 U.S. 57, 64 (1986).

86.     Defendant's conduct complained of herein violates Title VII.

87.     Plaintiff is female and thus a member of a protected class under Title VII due to her sex.

88.     As set forth in further detail elsewhere herein, Defendant treated Plaintiff and women in general far worse than similarly situated male employees.

00767126.2

FARHANG & MEDCOFF
— ATTORNEYS —

89.    Plaintiff subjectively perceived her workplace environment to be offensive, hostile, and abusive, and any objective, reasonable person would agree.

90.    The sexually hostile work environment Plaintiff was exposed to was permeated with discriminatory intimidation, was intolerable, and severe. The hostile acts and environment Plaintiff faced were so pervasive, indeed she felt their effects on a daily basis, such that Plaintiff's conditions of employment were negatively altered, and such that any reasonable person would consider same abusive and utterly unacceptable.

91.    The discrimination Plaintiff and other women faced because of their sex was purposeful, calculated, and intended to keep Plaintiff from advancing or enjoying a peaceful and welcoming work environment.

92.    Defendant's unlawful treatment of Plaintiff caused her significant damage in an amount to be proven at trial. Plaintiff is entitled to all damages recoverable under Title VII including, without limit, those damages arising from wages and benefits not paid for discriminatory reasons, emotional distress and mental anguish, inconvenience, plus interest thereon, and attorneys' fees and costs incurred herein and otherwise incurred by Plaintiff in seeking to vindicate her rights.

93.    Defendant's unlawful treatment of Plaintiff was gross, wanton, malicious, oppressive, and done with spite, ill will, and reckless indifference to Plaintiff's protected rights. Further, Defendant's conduct evinces an evil hand guided by an evil mind. As a result, Defendant is liable to Plaintiff for punitive damages, in addition to all other damages, in an amount to be proven at trial.

94.    Plaintiff satisfied all legal requirements, including the administrative processes required under federal and state law, to bring these claims.

95.    Plaintiff timely filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") relating to the matters complained of herein.

96.    On September 14, 2020, the Division of Civil Rights Section of the Arizona Attorney General's Office, at Plaintiff's request, issued Plaintiff a Notice of Right to Sue in connection with Defendants' violations of the Title VII and ACRA. Pursuant to applicable

FARHANG & MEDCOFF
— ATTORNEYS —

law, as soon as the state agency with concurrent jurisdiction issues a Notice of Right to Sue, Plaintiff may file a lawsuit based on related federal claims.

97.     The filing of Plaintiff's Title VII claims are timely under the law.

## COUNT II – RETALIATION IN VIOLATION OF TITLE VII

98.     Plaintiff incorporates herein by this reference each and every preceding allegation as if fully set forth herein.

99.     Plaintiff's complaints, questions, and filing EEOC Charges were activities protected under law, including under Title VII.

100.    Defendant retaliated against Plaintiff because she engaged in a protected activity intended to vindicate her rights and those of other females, including under Title VII.

101.    Defendant retaliated against Plaintiff as set forth elsewhere herein, including without limit, by demoting her, refusing promotions, setting her up to fail, and ultimately terminating her employment for pretextual reasons. In addition, Defendant retaliated against Plaintiff by first promising payment of her regular wages through February 28, 2020, but as soon as Plaintiff engaged in protected activities, including filing a complaint with the EEOC and engaging in other protected activities intended to vindicate her rights and those of other females, Defendant refused to abide by its written promises and paid Plaintiff only through February 11, 2020.

102.    Defendant's unlawful treatment of Plaintiff caused her significant damage in an amount to be proven at trial. Plaintiff is entitled to all damages recoverable under title VII for retaliation including, without limit, those damages arising from wages and benefits not paid for discriminatory reasons, emotional distress and mental anguish, inconvenience, plus interest thereon, and attorneys' fees and costs incurred herein and otherwise incurred by Plaintiff in seeking to vindicate her rights.

103.    Defendant's unlawful treatment of Plaintiff was gross, wanton, malicious, oppressive, and done with spite, ill will, and reckless indifference to Plaintiff's protected rights. Further, Defendant's conduct evinces an evil hand guided by an evil mind. As a

00767126.2

FARHANG & MEDCOFF
ATTORNEYS

result, Defendant is liable to Plaintiff for punitive damages, in addition to all other damages, in an amount to be proven at trial.

104.   Plaintiff satisfied all legal requirements, including the administrative processes required under federal and state law, to bring these claims.

105.   On September 14, 2020, the Division of Civil Rights Section of the Arizona Attorney General's Office, at Plaintiff's request, issued Plaintiff a Notice of Right to Sue in connection with Defendant's violations of the Title VII and ACRA. Pursuant to applicable law, as soon as the state agency with concurrent jurisdiction issues a Notice of Right to Sue, Plaintiff may file a lawsuit based on related federal claims.

## COUNT III - DISCRIMINATION IN VIOLATION OF ACRA

106.   Plaintiff incorporates herein by this reference each and every preceding allegation as if fully set forth herein.

107.   The Arizona Civil Rights Act, codified at A.R.S. § 41-1461, et seq. (the "ACRA"), makes it an unlawful employment practice under Arizona law for an employer to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. A.R.S. § 41-1463(B).

108.   Defendant's conduct complained of herein violates the ACRA.

109.   Plaintiff is female and thus a member of a protected class under ACRA due to her sex.

110.   Defendant terminated Plaintiff's employment because of discriminatory treatment toward women who happen to be ambitious and assertive.

111.   Plaintiff subjectively perceived her workplace environment to be offensive, hostile, and abusive, and any objective, reasonable person would agree.

112.   The sexually hostile work environment Plaintiff was exposed to was permeated with discriminatory intimidation and sexist overtones, was intolerable, and severe.  The hostile acts and environment Plaintiff faced were so pervasive, indeed she felt their effects on a daily basis, such that Plaintiff's conditions of employment were negatively

FARHANG & MEDCOFF
ATTORNEYS

00767126.2

1    altered, and such that any reasonable person would consider same abusive and utterly

2    unacceptable.

3        113.   The hostile work environment and the termination of Plaintiff's employment

4    constitute discrimination in violation of the ACRA.

5        114.   The discrimination Plaintiff faced because of her sex was purposeful,

6    calculated, and intended to keep her from advancing or enjoying a peaceful and welcoming

7    work environment.

8        115.   Defendant's unlawful treatment of Plaintiff has caused Plaintiff substantial

9    damage. Plaintiff is entitled to all damages recoverable under the ACRA including, without

10   limit, those damages arising from wages and benefits not paid for discriminatory reasons,

11   emotional distress and mental anguish, inconvenience, plus interest thereon, and attorneys'

12   fees and costs incurred herein and otherwise incurred by Plaintiff in seeking to vindicate

13   her rights.

14       116.   Defendant's unlawful treatment of Plaintiff was gross, wanton, malicious,

15   oppressive, and done with spite, ill will, and reckless indifference to Plaintiff's protected

16   rights.  Further, Defendant's conduct evinces an evil hand guided by an evil mind.  As a

17   result, Defendant is liable to Plaintiff for punitive damages, in addition to all other damages,

18   in an amount to be proven at trial.

19       117.   Plaintiff timely filed a charge of discrimination with the State of Arizona

20   Office of the Attorney General's Division of Civil Rights Section relating to the matters

21   complained of herein.

22       118.   On September 14, 2020, the Division of Civil Rights Section, at Plaintiff's

23   request, issued Plaintiff a Notice of Right to Sue in connection with Defendant's violations

24   of the ACRA.

25       119.   The filing of Plaintiff's ACRA claims are timely under law.

26           **COUNT IV – RETALIATION IN VIOLATION OF ACRA**

27       120.   Plaintiff incorporates herein by this reference each and every preceding

28   allegation as if fully set forth herein.

FARHANG & MEDCOFF
—— ATTORNEYS ——

00767126.2

- 19 -

121.   Plaintiff's complaints, questions, and filing ACRD Charges were activities protected under law, including under ACRA.

122.   Defendant retaliated against Plaintiff because she engaged in a protected activity intended to vindicate her rights and those of other females, including under ACRA.

123.   Defendant retaliated against Plaintiff as set forth elsewhere herein, including without limit, by demoting her, refusing promotions, setting her up to fail, and ultimately terminating her employment for pretextual reasons. In addition, Defendant retaliated against Plaintiff by first promising payment of her regular wages through February 28, 2020, but as soon as Plaintiff engaged in protected activities, including filing a complaint with the ACRD and engaging in other protected activities intended to vindicate her rights and those of other females, Defendant refused to abide by its written promises and paid Plaintiff only through February 11, 2020.

124.   Defendant's unlawful treatment of Plaintiff caused her significant damage in an amount to be proven at trial. Plaintiff is entitled to all damages recoverable under ACRA for retaliation including, without limit, those damages arising from wages and benefits not paid for discriminatory reasons, emotional distress and mental anguish, inconvenience, plus interest thereon, and attorneys' fees and costs incurred herein and otherwise incurred by Plaintiff in seeking to vindicate her rights.

125.   Defendant's unlawful treatment of Plaintiff was gross, wanton, malicious, oppressive, and done with spite, ill will, and reckless indifference to Plaintiff's protected rights. Further, Defendant's conduct evinces an evil hand guided by an evil mind. As a result, Defendant is liable to Plaintiff for punitive damages, in addition to all other damages, in an amount to be proven at trial.

126.   Plaintiff satisfied all legal requirements, including the administrative processes required under federal and state law, to bring these claims.

127.   Plaintiff timely filed a charge of retaliation with the State of Arizona Office of the Attorney General's Division of Civil Rights Section relating to the matters complained of herein.

128.   On September 14, 2020, the Division of Civil Rights Section, at Plaintiff's request, issued Plaintiff a Notice of Right to Sue in connection with Defendant's violations of the ACRA.

129.   The filing of Plaintiff's ACRA claims are timely under law.

**COUNT V – VIOLATION OF ARIZONA WAGE ACT, A.R.S. § 23-350 *et seq.***

130.   Plaintiff incorporates herein by this reference each and every preceding allegation as if fully set forth herein.

131.   At all relevant times, Plaintiff was an employee of Defendant, as defined by A.R.S. § 23-350(2).

132.   At all relevant times, Defendant was the employer of Plaintiff, as defined by A.R.S. § 23-350(3).

133.   Pursuant to the Arizona Wage Act, A.R.S. § 23-350 *et seq.* ("AWA"), "hours worked" includes all time an employee is employed and "wages" means nondiscretionary compensation due an employee in return for labor or services rendered by an employee for which the employee has a reasonable expectation to be paid whether determined by time, task, piece, commission or other method of calculation.

134.   From January 10, 2020 through January 24, 2020, Plaintiff lost approximately sixteen (16) hours of PTO for unknown reasons. Defendant agreed to pay out all unused PTO, but never paid Plaintiff for the lost sixteen hours of PTO, a gross amount of approximately $769.23.

135.   Pursuant to the AWA, Plaintiff is entitled to an amount that is treble the amount of unpaid wages related to this loss of PTO payout, a gross amount of approximately $2,307.69.

136.   The Transition Agreement provided to Plaintiff confirmed Defendant promised to employ Plaintiff through February 28, 2020, the Separation Date.

137.   The Transition Agreement expressly stated Defendant would pay Plaintiff her regular wages through February 28, 2020 regardless of whether Plaintiff signed the Transition Agreement.

FARHANG & MEDCOFF
—— ATTORNEYS ——

00767126.2

138.   Plaintiff had a reasonable expectation of receiving her wages through February 28, 2020.

139.   Despite its express written promises, Defendant intentionally refused to pay Plaintiff's wages from February 11, 2020 through February 28, 2020, a gross amount of approximately $4,657.54.

140.   To date, Defendant failed or refused to pay Plaintiff's wages due for February 11, 2020 through February 28, 2020.

141.   Pursuant to the AWA, Plaintiff is entitled to an amount that is treble the amount of unpaid wages from February 11, 2020 through February 28, 2020, a gross amount of approximately $13,972.60.

142.   Plaintiff is also entitled to interest, costs, and reasonable attorneys' fees pursuant to the AWA violations.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues and claims so triable.

## REQUESTED RELIEF

**WHEREFORE,** Plaintiff respectfully requests that the Court:

A.   Enter judgment for Plaintiff and against Defendant on all counts;

B.   Award Plaintiff all recoverable damages, in an amount to be proven at trial;

C.   Award Plaintiff treble damages in an amount to be proven at trial, but in no event less than $18,630.14 for Defendant's violation of the AWA;

D.   Award Plaintiff her taxable costs and reasonable attorneys' fees incurred during her efforts to resolve these disputes prior to filing this lawsuit, and such costs and attorneys' fees incurred herein, pursuant to 42 U.S.C. § 2000e-5(k), A.R.S. § 41-1481(J) and any other applicable legal right/provision;

E.   Award Plaintiff punitive and/or exemplary damages on all claims under which such damages are available under law in an amount to be determined at trial;

F.   Award Plaintiff pre- and post-judgment interest at the highest rate allowed by law; and

00767126.2

1          G.     Grant Plaintiff any other relief that the Court deems just and proper under

2    circumstances

3    DATED:  November 3, 2020     FARHANG & MEDCOFF PLLC

4                                  Respectfully submitted,

5

6                             By:   /s/ Roscoe J. Mutz

7                                    Ali J. Farhang

8                                    Roscoe Mutz
                                *Attorneys for Plaintiff*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FARHANG & MEDCOFF
—— ATTORNEYS ——